

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00059-CV

IN THE MATTER OF D.M.

----------

FROM COUNTY COURT AT LAW NO. 1 OF DENTON COUNTY
TRIAL COURT NO. JV-2015-00028

----------

## MEMORANDUM OPINION[1]

----------

In a single point, Appellant D.M. appeals the trial court's order modifying the terms of his probation and placing him in the custody of the Texas Juvenile Justice Department (TJJD). We affirm.

## Background

### I. D.M.'s childhood

By all accounts, D.M. has had a rough childhood. A child of parents with drug abuse issues, D.M. spent most of his years living with his paternal

---

[1]*See* Tex. R. App. P. 47.4.

grandmother in California while his father was in and out of jail. From an early age, D.M. displayed emotional and behavioral problems including Oppositional Defiant Disorder, depression, mood swings, and suicidal behavior. When he was about four years old, D.M. started family counseling with his grandmother, and they continued to participate in counseling until 2014.

Unfortunately, despite counseling, D.M. continued to struggle with behavioral issues. As he grew older, he frequently got in trouble at school, and he developed a fascination with setting fires. He looked up to his father, a member of the Nazi Low Riders gang who had a significant criminal history[2] as well as a history of heroin and methamphetamine use.

## II. The proceedings below

In 2014, when he was 12 years old, D.M. moved to Texas to live with his mother, her husband, and two of D.M.'s half-siblings. In January 2015, D.M. was charged with aggravated sexual assault of his four-year-old half-sister. *See* Tex. Penal Code Ann. § 22.021 (West Supp. 2017). The charge was subsequently modified to causing bodily injury to a minor. *See id*. § 22.04 (West Supp. 2017). After he was charged, D.M. revealed in a psychological evaluation that he had been sexually abused by a teenage male neighbor when he was between six and eight years old.

---

[2]His father was in jail at the time of the final hearing in this case.

In a report resulting from the same psychological evaluation, the court-appointed psychologist recommended that D.M. participate in a sex-offender treatment program in a "structured, behaviorally oriented placement that provides simultaneous mental health services along with treatment for sexual behavior problems." The psychologist also strongly recommended continued psychiatric consultation to address D.M.'s "mood disturbance, aggressive behaviors, and underlying hyperactivity and deficits in attention."

Accordingly, shortly after the trial court temporarily released D.M. into the custody of his grandmother[3] in California in March 2015, D.M. began participating in weekly counseling sessions with a sex-offender treatment provider and, at some point, was treated by a psychiatrist and prescribed medications. But D.M. continued to get into trouble. He faced several disciplinary actions at school for poor behavior, including fighting with another student and using profanity toward students and staff. He was suspended from school three times. In December 2015, the trial court found that D.M. had violated the terms of his release and ordered that D.M. be detained in the Denton County Juvenile Detention Center.

---

[3]The trial court initially released D.M. into the custody of his father and grandmother but later modified the order to state that his father was not permitted to reside with D.M. and his grandmother.

## A. Grayson County Boot Camp

In January 2016, after D.M. signed a judicial confession admitting that he had caused bodily injury to his half-sister, the trial court adjudicated D.M. as having engaged in delinquent conduct. *See id.* Taking into account the court-appointed psychologist's recommendation, the trial court placed D.M. on specialized probation and ordered him to complete a 270-day program at the Grayson County Boot Camp (Grayson).

Grayson operated on a point system in which participants could earn up to 20 points per day based on their behavior. To successfully complete the program, D.M. had to earn 5,400 points and complete a sex-offender treatment program. Over the next eight months, D.M. continued his troublesome behavior and earned 0 points. A six-page behavioral summary document that the trial court admitted into evidence at the modification hearing described multiple instances of D.M.'s refusing to participate in programs, failing to follow directions, horse playing, hurling profanities and racial slurs at staff and peers, threatening physical harm to other participants, and making sexually inappropriate comments and threats to others. More than 100 additional pages of individual incident reports, confinement review forms, and disciplinary referral forms describing various incidents of misbehavior were also admitted.

In October 2016, D.M.'s case manager, Karla Doster, his counselor, Jonathon Neece, and other Grayson staff members decided to discharge D.M.

4

from the program because of his behavior. Doster and Grayson's deputy director summarized D.M.'s poor behavior in a letter dated October 18, 2016, as follows:

> Although he had access to facility rules and guidelines, he was persistent in continuing to violate facility rules while in placement. [D.M.] has received a total of 88 behavioral reports since his arrival. He received 36 confinement reports and 52 solution sheets. . . .
>
> [D.M.] attended group and individual sessions . . . [but] was removed from group on several occasions for negative behavior. This behavior included being disruptive and impeding the progress of others in treatment, threatening peers, making racial slurs, cursing, [and] disrespect[ing] . . . staff and peers. Minimal internal progression was made on [D.M.]'s part which is evident by the seriousness of his negative behaviors displayed in placement.
>
> [D.M.] exhibited the following negative behaviors, but not limited to: assaults on peers, self-referral to confinement, threatening staff and residents, refusal to do physical training, causing group disruptions, refusal to participate in the program, disruption of the program where there is a safety and security threat, threatening staff and peers, racial slurs towards others, ridiculing, or attempting to intimidate or assault staff, residents or visitors and not following staff's instructions, [and] refusal to participate in specialized treatment group (sex offender treatment). [D.M.] also assaulted a peer while in placement on 10.16.16.

Accordingly, D.M. was unsuccessfully discharged from the program on October 19, 2016.

## B. Motion to modify the terms of probation

Following D.M.'s discharge from Grayson, the State moved to modify the terms of probation. *See* Tex. Fam. Code Ann. § 54.05 (West Supp. 2017). At the modification hearing, the trial court first considered whether D.M. had violated the terms of probation. After hearing the evidence, including testimony from Doster and D.M.'s probation officer, Jodie Vincent, regarding D.M.'s unsuccessful

discharge from Grayson, the trial court found that D.M. violated the term of his probation requiring him to successfully complete the program at Grayson. D.M. does not contest this finding on appeal.

## C. Disposition

Once the trial court found that D.M. had violated the probation terms, it considered whether to modify the terms of disposition. The State urged that the only appropriate disposition was to commit D.M. to the custody of TJJD, whereas D.M.'s counsel argued that alternatives were available and requested that the trial court send him to another treatment facility. The following evidence was presented to the trial court.

### i. D.M.'s sex-offender treatment and lack of genuine remorse

While at Grayson, Neece provided sex-offender counseling to D.M. According to Neece, D.M. told him about sexual contact D.M. had with seven different children, including his half-sister and his one-year-old brother. D.M. described the instances as "very impulsive, not really thinking about doing it, just doing it, seeing opportunity and taking it." According to Neece, D.M. also confessed to attempting to sexually abuse a dog.

In Neece's observation, D.M. refused to be held accountable and failed to take responsibility for his own behavior. Neece testified that any remorse D.M. showed for his actions appeared disingenuous and that D.M. would refer to them as "bad decisions" or "mistakes." In Neece's view, "[I]t seem[ed] like the regret was more along the lines of, 'I did it and I got in trouble, so I'm sorry,' not, 'I'm

6

sorry for hurting people,' or 'I'm sorry for doing bad things to people.'" Neece acknowledged that D.M. successfully completed some of his sex-offender counseling assignments, but Neece also testified that D.M. did not show progress in implementing the lessons from his assignments by making positive changes or altering his attitude, beliefs, or behaviors. Neece felt that D.M. was just trying to appease everyone by completing the assignments, and testified, "I think he likes the way he is, and he doesn't have very much motivation to change."

In a social history filed in February 2017, juvenile court services echoed Neece's evaluation, noting that, despite D.M.'s progress in portions of the sex-offender program, "his behaviors showed his lack of internalizing and executing the taught concepts, specifically, poor impulse control and decision making skills." It assessed D.M. as having a "'moderate to high' risk level in regards to his sexual recidivism."

### ii. D.M.'s claimed Nazi ties

Doster and Neece both testified about D.M.'s affinity toward the Nazi subculture. Neece recounted D.M.'s claim during a group session that his grandfather was a former Nazi officer, and Doster testified that D.M. told her he was a Nazi. Neece observed that D.M. idolized his father and that he attempted to garner respect through fear and intimidation, bragged about gang culture and criminal culture, and admitted to selling drugs and carrying firearms.

### iii. Additional testimony about D.M.'s bad behavior in Grayson

7

Doster and Neece related their general observations of D.M.'s troublesome behavior at Grayson, including his physical and verbal abuse toward staff members, his disruptive behavior during group therapy sessions, and his threatening behavior toward other participants. Specifically, Neece recounted an instance when D.M. threatened to "shank" another participant with a pencil during a group session.

### iv. D.M.'s family and their lack of involvement

At the time of trial, D.M.'s mother was not willing to allow D.M. to live with her again and had, in Vincent's opinion, abandoned D.M. According to Vincent, D.M.'s father wanted to be involved, but Vincent expressed concern about his father's criminal history, drug use, and gang affiliation. Vincent also testified that officials in California, where D.M.'s father lived on-and-off with D.M.'s grandmother, refused to release D.M. into his father's care because of safety concerns.

The social histories submitted to the court and testimony at the hearing made it clear that D.M.'s grandmother had gone to great lengths to help D.M. as a child. D.M.'s grandmother had fought for D.M. through custody battles, obtained counseling for him, sought appropriate medication for his disorders, and had tried to facilitate a relationship between D.M., his father, and his mother. But by the time of trial, Vincent reported minimal contact with D.M.'s family, including his grandmother. Vincent also noted that none of his family had ever attended a

8

hearing although they were duly notified.  According to Vincent, no one was available to participate in any treatment program with D.M.

### v. Treatment options and Vincent's recommendations

Vincent testified that the probation department could not find a home placement for D.M. that could provide the appropriate level of care and supervision to meet the terms and conditions of probation.  Vincent had applied to three residential treatment facilities on D.M.'s behalf, and two—one in Iowa and the other in Brownwood, Texas—had indicated they would accept his application.  Both had sex-offender treatment programs, family components, and educational programs, and their programs lasted between 9 and 12 months. Nevertheless, according to Vincent, the Department recommended that D.M. be placed in the custody of TJJD because it could provide the same sort of treatment for an open-ended amount of time—until D.M. successfully completed the program or turned 19 years old.

### vi. Medication concerns and D.M.'s request for additional treatment

D.M.'s counsel took the position that his failure to succeed at Grayson may have been due to a failure to obtain the right prescription medication. The attorney advocated that the trial court send D.M. to one of the two residential treatment programs, not TJJD.

D.M.'s guardian ad litem, Prudence Sanchez, agreed that D.M.'s medication was not properly managed at Grayson.  According to Sanchez, at

9

some point, D.M.'s grandmother and father expressed a concern about D.M.'s medication, and D.M. told her that his medication was making him angry and irritable and interfering with his sleep. Sanchez arranged for D.M. to see a doctor, and the doctor changed his medication and gave him a medication to help him sleep. Sanchez testified that with that change in medication, D.M. appeared "very calm" to her and that others had noticed as well, commenting and praising him on how he seemed to be able to think before acting. Vincent also testified that after D.M. had been released from Grayson and changed medications, he seemed to be struggling less in detention.

Vincent and Doster testified that although D.M. expressed concern about his medication to Sanchez, he had never expressed a concern about his medication to them while at Grayson. Doster testified that she asked D.M. more than once if he had any concerns about the medication he was taking, and his response was generally "along the lines of meh . . . [and] a shrug of the shoulder." And even though she interpreted D.M.'s response to mean, "I'm okay," she nevertheless followed up with him and discussed this with the therapist on staff.

### vii. The trial court's ruling

The trial court ordered D.M. be committed to TJJD for an indeterminate amount of time, or until his 19th birthday. Among other findings in the disposition order, the trial court found that reasonable efforts had been made to prevent the need for D.M. to be removed from his home, but it was in D.M.'s best interest or

that of the community to place him with TJJD. The trial court also found that D.M. had a history of aggressive and persistent delinquent behavior, that local resources of the trial court were inadequate to properly rehabilitate D.M., and that the seriousness of the offense required D.M. be placed in a restrictive environment to protect the public. Finally, the trial court found that D.M. could not be provided the quality of care and level of support and supervision that he needed to meet the conditions of probation if he remained in his home.

**Discussion**

In a single point on appeal, D.M. argues that the evidence was insufficient to support the trial court's findings that (a) placement outside the home was in D.M.'s best interest, (b) reasonable efforts had been taken to prevent or eliminate the need for D.M.'s removal from home, or (c) D.M. could not receive the quality of care and level of support and supervision needed to meet the conditions of probation if he was placed at home.

A juvenile court has broad discretion to determine a suitable disposition for a child who has been adjudicated as having engaged in delinquent conduct. *In re C.C.B.*, No. 02-08-00379-CV, 2009 WL 2972912, at *3 (Tex. App.—Fort Worth Sept. 17, 2009, no pet.) (mem. op.) (citing *In re H.G.*, 993 S.W.2d 211, 213 (Tex. App.—San Antonio 1999, no pet.)). An abuse of discretion occurs only when the juvenile court acts unreasonably or arbitrarily without reference to any guiding rules or principles. *Id.*

11

A trial court does not abuse its discretion simply by basing its decision on conflicting evidence. *See In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.). And we will not find that a trial court abused its discretion as long as some evidence of substantive and probative character exists to support the trial court's decision. *Id.* In conducting the review, we engage in a two-pronged analysis: (1) did the trial court have sufficient information upon which to exercise its discretion, and (2) did the trial court err in its application of discretion? *C.C.B.*, 2009 WL 2972912, at *3.

The trial court may modify a disposition based on a finding of delinquent conduct in violation of the penal code and commit the child to TJJD if the court finds by a preponderance of the evidence that the child violated a reasonable and lawful order of the court. Tex. Fam. Code Ann. § 54.05(f). On appeal, D.M. does not contest the trial court's decision in this respect. His complaint is limited to the trial court's required findings under section 54.05(m)(1)[4] that (a) it is in D.M.'s best interest to be placed outside his home, (b) reasonable efforts were made to prevent the need for his removal from his home and to make it possible for him to return home, and (c) D.M., in his home, cannot be provided the quality

---

[4]Although both parties refer us to section 54.04(i) in their briefs, we note that because this was a modification proceeding, the applicable section is 54.05(m). *See* Tex. Fam. Code Ann. § 54.04(i) (West Supp. 2017) (requiring findings in original disposition of a juvenile delinquency charge), § 54.05(m) (requiring findings in proceeding to modify disposition).

of care and level of support and supervision that he needs to meet the conditions of probation. *Id.* § 54.05(m)(1).

We apply the civil standards of review to D.M.'s complaints of the insufficiency of the evidence supporting the disposition findings. *C.J.H.*, 79 S.W.3d at 703; *see also In re E.K.G.*, 487 S.W.3d 670, 673–76 (Tex. App.—San Antonio 2016, no pet.) (discussing application of the civil standards of review to evidentiary sufficiency complaints regarding juvenile dispositions). When determining whether there is legally sufficient evidence to support the finding under review, we consider evidence contrary to the finding unless a reasonable fact finder could not. *In re M.E.*, No. 02-14-00051-CV, 2014 WL 7334990, at *2 (Tex. App.—Fort Worth Dec. 23, 2014, no pet.) (mem. op.); *see C.J.H.*, 79 S.W.3d at 703. Anything more than a scintilla of evidence supporting a finding renders the evidence legally sufficient. *C.J.H.*, 79 S.W.3d at 703.

When reviewing an argument that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *M.E.*, 2014 WL 7334990, at *2; *C.J.H.*, 79 S.W.3d at 703.

Because it is unclear from his brief whether D.M. raises a legal sufficiency challenge or a factual sufficiency challenge here, we will address both.

D.M. argues that he was not given a fair chance to succeed when he was placed at Grayson without the aid of proper medication and asks this court to reform the ruling to allow him to serve a probationary period living with his grandmother, his father, or at the Iowa or Brownwood treatment facilities. In doing so, D.M. asserts in his brief that the only relevant evidence considered by the trial court was Vincent's testimony and the "stale" 2015 social history report. This is wholly inaccurate. The trial court was presented with testimony from Vincent, Neece, and Doster, as well as testimony from Sanchez, his guardian ad litem, the 2015 social history report, 110 pages describing D.M.'s behavioral infractions while at Grayson, and the October 2016 letter describing the reasons for his unsuccessful discharge from Grayson. The trial court also took judicial notice of its file, which included the 2015 psychological evaluation and an updated 2016 social history report.

This testimony and evidence informed the trial court of D.M.'s many past behavioral transgressions in and out of Grayson, his affinity toward the Nazi subculture, his father's ties to drugs, criminal activity, and a Nazi gang, his confessions to multiple acts of sexual misconduct, his apparent lack of genuine remorse for his actions, and his family's lack of involvement. His mother was not involved in the proceedings and did not want D.M. to return to her home with her other children, including the half-sister that D.M. assaulted. And although his grandmother expressed a desire to help D.M., she did not participate in any of

14

the court proceedings and could not participate in any of the counseling or treatment programs.

Despite D.M.'s argument in his brief that his behavior should be blamed on a lack of proper medication, the evidence presented was nevertheless sufficient to support the trial court's findings that it was in D.M.'s best interest to be placed with TJJD.  *See, e.g.*, *C.J.H.*, 79 S.W.3d at 704–05 (holding placement with TJJD was supported by evidence of appellant's sexual assault of a young child, appellant's lack of remorse, and lack of other long-term treatment options).  D.M. admitted as much in his brief, stating that he "cannot win" under the applicable standards of review and instead relies upon our "broad discretionary authority" to reverse the trial court's ruling.  But D.M. asks us to do that which we cannot do.

It is well-established that "[t]he mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred."  *Downer v. Aquamarine Operators*, *Inc.*, 701 S.W.2d 238, 242 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).  We cannot disturb the trial court's decision absent an abuse of discretion.

Based on our review of the record, we find both legally and factually sufficient evidence to support the trial court's ruling, and thus we hold that the trial court acted within its discretionary authority by placing D.M. with TJJD.  We therefore overrule D.M.'s sole point on appeal.

**Conclusion**

15

Having overruled D.M.'s sole point on appeal, we affirm the trial court's order.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; MEIER and GABRIEL, JJ.

DELIVERED:  April 5, 2018